HENRY T. SMITH, *et al.*, plaintiffs in error, *vs.* BOYKIN R. SMITH, defendant in error.

Specific performance of a contract in writing and under seal, made for and in behalf of minors, by an adult friend, with a brother who has attained his majority, as to the terms upon which their father's property shall be divided, will be decreed against such adult brother.

The doctrine of the *want of mutuality* in the agreement in this case does furnish the correct rule for the decision of the case made by the record.

Bill for specific performance. Demurrer. Decided by Judge WM. M. REESE, presiding for Judge AUGUSTUS REESE, Jasper Superior Court, April Term, 1867.

William G. Smith died in 1864, leaving as his heirs at law Henry T. Smith, Martha Penn, Thomas Penn, Russel Penn, Henry F. Penn, and Salina Penn, minors; Charles H. Thompson, Alice Clark and Emma Clark, minors; Kesiah Smith, widow of Henry G. Smith, deceased, Georgia Nixon, wife of Jesse F. Nixon, and Boykin R. Smith. His estate of realty and personalty was worth one hundred thousand dollars, or other large sum, at his death.

For some weeks after his death the heirs were in doubt whether he died testate or intestate. Boykin R. Smith knew that a paper called a will had been executed by deceased about a year before his death. Boykin R. Smith was officious in getting it up, and drew the instructions from which said Jesse F. Nixon drafted the same. By it said Boykin R. was to be almost the sole legatee. What had become of that paper none of the parties knew. The estate was without a legal representative. In some way the parties learned that said paper had existed, and the provisions of it, and frequently discussed them.

In these discussions Henry T. Smith, in presence of said Boykin R. Smith, denounced said paper as a fraud upon the deceased and his heirs, declaring that it was made under the dictation of said Boykin R., who had taken advantage of the weakness of deceased to impose upon him when he was in his seventy-ninth year, paralyzed and imbecile in body and mind, and perfectly pliant, and had fraudulently induced

said deceased to give to him nearly his entire estate. Henry T. Smith further declared that he was unalterably determined to oppose the probate of said paper as the will of deceased, should it ever be found and offered for probate.

After some weeks, said paper still being lost, and it appearing that the said estate would pass under the acts of distribution, said Boykin R. became anxious to hold certain specific property, which he pretended had been given to him by proper deeds, conveyances, and bills of sale, made by deceased.

If such deeds, conveyances, and bills of sale were ever made, they were not out of the possession of deceased, nor was the possession of the property covered by them ever changed from deceased to Boykin R. Deceased had kept both the writings and the property, and Boykin R. had not claimed the property during the life of deceased, nor since his death. Boykin R. knew these facts, and that his said claim was at least very doubtful. Still it seemed probable that he would be compelled to take a smaller part of said estate than he would get under said pretended will, and he preferred these specific things to his share upon a distribution of the estate. Knowing that if the pretended will were found and offered for probate it would cause a law suit and a family difficulty, and that his imposition and undue influence in obtaining it were true, and the paper an outrage upon the others of the family and unjust in its discrimination, in order to secure said specific property said Boykin R. proposed that the estate should be distributed by agreement of the parties at interest, thereby saving expense, avoiding litigation, and preserving peace and harmony.

There were no debts to be paid, and the parties all consented so to divide the estate, by agreement, as follows:

GEORGIA, JASPER COUNTY.

We, the legatees and representatives of legatees of the estate of William G. Smith, Sr., deceased, met on the 16th day of November, 1864, for consultation in regard to the settlement and distribution of said estate, do severally consent and agree that B. R. Smith have certain negroes, deeded

to him by his father when said B. R. was quite young, and their increase up to the time when B. R. became twenty-one years of age; that he is to have a certain tract or parcel of land in the County of Newton, known as the Evans place; then said B. R. is not to draw any more from said estate until the other legatees are made equal with him, except the Perry tract of land, jack, goats, buggy and harness, which said B. R. claims as his own property, purchased by himself; also, two negroes hired from Thomas Smith's estate, and half of all the provisions raised the present year, as compensation for his own and his wife's hands.

We further agree that the taxes are to be paid out of the estate; that the physician's bills for the estate negroes are to be paid out of the estate, (the said B. R. Smith paying his own physician's bill, and also that of the negroes held in right of his wife.)

We further agree that the bond made by the said B. R. Smith and Wm. G. Smith, to be paid by the estate, to wit: bond to the Confederate Government; and that the one-half of the receipts for the same to be paid by the said B. R. Smith, and that the other half, together with all other property, not herein before specially conceded to said B. R. Smith, be divided between the widow and the other legatees, agreeably to the law or laws in such cases made and provided.

We further agree that this be a final basis of settlement between all the parties as aforesaid, as witness our hands and seals.

> W. G. SMITH,
> J. F. NIXON, for ALICE
>     and EMMA CLARK,
> H. T. SMITH,
> KESIAH SMITH,
> WILLIAM C. PENN,
> WM. H. THOMPSON, for
>     C. H. THOMPSON,
> J. F. NIXON,
> B. R. SMITH.

All the heirs, personally or by attorney, signed said agreement. ·Before and after it was signed, Boykin R. repeatedly said that the pretended will was inequitable ; that this agreement was equitable and just ; and that by it he intended to prevent forever any chance of dispute about said pretended will.

In pursuance of said agreement, said heirs at law appointed Charles F. Campbell, Robert Barnes, Benjamin T. Digby, Henry Walker, and Elbert Gay to appraise and then distribute the property of said estate according to said agreement.

On the ―― day of ――, 1864, said commissioners met for the purpose of performing said trusts, &c., and proceeded till so embarrassed in adjusting the shares on an equitable basis, (on account of the great difference then in nominal value between prices then and before the war,) they determined that the best mode of equalizing the shares according to said agreement, was to sell the entire property, except what had been by the agreement specifically allotted to Boykin R. Smith.

Accordingly, cattle, corn, fodder, oats, and other perishable property, was, after due advertisement, sold for $70,000.00, or other large sum, which was paid by the purchasers to the commissioners.

A few days after said sale, when complainants and other purchasers went to take the property which they had bought at said sale, they were told by said Boykin R. that he had found said pretended will, and that he claimed all the property which said paper conferred upon him under the aforesaid family settlement and compromise, but would set up the said paper as a will and claim under it.

The commissioners refused to go further, and at once turned over to said Boykin R. the proceeds of said sale, and all the other property of the estate, which consisted of one hundred and fifty head of hogs, twenty cows and calves, fifty head of sheep, ten horses and mules, forty negroes, twenty bales of cotton, three hundred barrels of corn, one hundred bushels of peas, one hundred bushels of wheat, thirty thousand

Smith *et al. vs.* Smith.

pounds of fodder, farming tools and implements, household and kitchen furniture, worth $300.00, and proceeds of a sale of a lot of whiskey. All of said property and the lands of deceased are held by Boykin R. and Kesiah Smith, in disregard of said agreement.

Upon these allegations in their bill, the other heirs claim that Boykin R. Smith is trustee for them, and pray that by him, said Kesiah, and said Jesse F. Nixon, said agreement be specifically performed, and for discovery and account, and such further and other relief as is equitable.

Said defendants demurred. The grounds of demurrer were: Because complainants had not made such a case as entitled them to discovery and relief; and because Kesiah Smith and Jesse F. Nixon and his wife, Georgia Nixon, are improperly made parties defendant, as no discovery or relief is sought from them ; and because the remedies of complainants are complete at law ; and further, because no one has the right to receive the property except a legal representative. No consideration is alleged for said contract or agreement, and all the parties in interest have not signed the same ; because the proceeds of the sale went into the hands of complainants' agents, and as by the agreement the property is to be distributed according to the law, it must be distributed under the will, which is the law in this case controlling the distribution.

Upon the hearing, the Court sustained the demurrer and ordered the bill dismissed.

The plaintiffs in error assign this order as error.

W. A. LOFTON and JUNIUS WINGFIELD, for plaintiffs in error.

J. J. FLOYD, GEO. F. BARTLETT, and W. W. CLARK, for defendants in error.

Smith *et al.* *vs.* Smith.

HARRIS, J.

The general demurrer in this case was sustained by the Court below on the sole ground that·" there was a want of mutuality in the contract sought to be specifically enforced." This decision appears to us to be the result of a mistake of the facts. All the parties signing the agreement for the division of the property are *adults,* none are minors. Thus, these are unquestionably parties capable of contracting with each other, and who do actually contract. That some of the parties contracting did so in behalf of minors, and to promote their interest, furnishes in Equity no just ground for refusing to enforce the agreement. They are doubly liable by their action—they are liable to defendants and they are liable to the minors—and this liability to defendants is, of itself, a refutation of the idea that there is no mutuality.

But had the facts been as the Judge supposed them to be, and as they were argued to be here by the counsel of Boykin R. Smith—that is, that " the agreement" was made with minors by him—we do not perceive how that would affect the mutuality of the contract, though it might affect the mutuality of remedy. To say, in such a case, that there is no mutuality of contract, because it was made with minors, is to assert such a contract as absolutely void. See Reeves Domestic Relations, 243, 249. Few, very few contracts, (and those chiefly on grounds of public policy) made by minors, are by law declared *void;* most of the contracts of minors are merely *voidable,* and within this latter division would "the agreement" here fall. This distinction of the contracts of minors into void and voidable, was first clearly marked out by Lord Mansfield, in Touch vs. Parsons, 3 Burrows Reports, and it has been acted on in England and America ever since as law.

If " the agreement" is voidable, at whose instance? Certainly, unless for fraud or mistake, not by Boykin R. Smith, but by the minors. And when? The law gives them until after they have attained their majority, to confirm or repudiate it at *their election.* The adult B. R. Smith continues bound during the interval, and properly—it was his volun-

tary act to enter into the agreement, and if he made it with minors, there is, there should be, no escape for one who treats with minors, knowing them to be such—he treats with a presumptive knowledge of the protective principles of law made in their behalf.

So that whether "the agreement" was made with adults or minors, it is binding on Boykin R. Smith, if it is founded on a sufficient consideration.

What has been said disposes of the question of mutuality in the contract, or, in other words, that one party cannot be bound where the other is not, by shewing that to "the agreement" here there are competent parties who are bound to each other by its provisions.

There is, however, a want of mutuality spoken of in the books which does not go to the destruction of the contract, but it furnishes simply a rule of practice or ground upon which chancery will take jurisdiction to grant specific performance or enforce agreements. This is termed mutuality in remedy. This question arises most frequently in that large class of cases growing out of the transactions of vendors and vendees. It is often made the criterion in determining whether equity will take cognizance of the case or not—thus, if it should appear that the remedies are alike and mutual, specific performance will be decreed; if not, it declines jurisdiction, and turns a party back on his rights in a court of law for damages or compensation. See Willings vs. Cottal, 1 Simons & Stuart, 174; Adderly vs. Dixon, 1 Simons & Stuart, 607.

It is very important to guard against confounding want of mutuality in the contract and want of mutuality in the remedy. In the case under review we think both exist.

Is the agreement on *consideration?*

It purports to be under seal; the solemnity of a sealed instrument imports consideration, or, to speak more accurately, it estops a covenantor from *denying a consideration,* except for fraud. It is upon this principle that Courts of Equity decree payment of voluntary bonds. 1 Fonblanque Eq. Ch. 5 Note A ; 3 Peere Wm. Repts., 222.

Compromises of doubtful rights are upheld by general policy, as tending to prevent litigation, in all enlightened systems of jurisprudence. 3 vol. Burge Com., 742 ; Pickering vs. Pickering, 2 Beavan, 56 ; Naylor vs. Winch, 1 Simons & Stuart, 565.

Much more readily will Courts of Equity give effect to agreements of compromise of conflicting claims, especially *when they partake of the nature of family arrangements,* as will be seen by an examination of the cases hereinafter cited. See Batten on Contracts, p. 70, and cases there cited.

The earliest case, perhaps—certainly the leading case on the subject of *family agreements*—is that of Stapleton vs. Stapleton, 1st Atkins' R.   Lord Hardwicke says : An agreement entered into upon a supposition of a right or of a doubtful right, *though it afterwards comes out that the right was on the other side,* shall be binding, *and the right shall not prevail against the agreement of the parties.*

The compromise of a doubtful right is a *sufficient foundation* for an agreement.

Where agreements are entered into to save the honor of a family, and are reasonable, a Court of Equity will, if possible, decree performance of them.   "From this decision down to the present day, says Chancellor Sugden, in Westby vs. Westby, 2 Drury & Warren, 503, (cited in 2d White & Tudor, Eq. cases, in notes to Stapleton vs. Stapleton,) the current of authorities are *uniform,* that whenever doubts and disputes have arisen with regard to the rights of different members of the same family, and fair compromises have been entered into to preserve the harmony and affection, or save the honor of the family, those arrangements have been sustained by Courts of Equity, *albeit perhaps resting on grounds which would not have been satisfactory if the transaction had occurred between mere strangers."*

The Court will not enquire into the adequacy or inadequacy of the consideration.   It is *enough to support the agreement* that there was a doubtful question, and a compromise fairly and deliberately made upon consideration, and the actual rights of the parties, whatever they might be, cannot

affect the question.    Per Sir John Leach, V. C., in Naylor vs. Winch, 1 S. & S., 565.

In the same case, the Vice Chancellor also said : " In doubtful questions, such as upon the construction of a will, it is extremely reasonable that the parties should terminate their differences by dividing the stake between them in the proportion which may be agreed on."

In Neal vs. Neal, 1 Keen, 672, Lord Langdale sustained an agreement in *parol* as to a partition of lands devised to two brothers, saying, " Looking at this case with reference to those principles deducible from the cases cited at bar, he was of the opinion that the agreement here, though by parol, as it was *in the nature of a family arrangement,* was an agreement which the Court would enforce."

The obligatory character of these family agreements is illustrated in the case of Pullen vs. Ready, 2 Atkins, 587. The agreement in this was between brothers and sisters, founded upon the assumption that all were entitled under a will.    Lord Hardwicke enforced the agreement, as there was a neglect on the part of those complaining in acquainting themselves with the facts and legal consequences of them.

In Stockly vs. Stockly, 1 Vesey & Beam, 30, Lord Eldon recognizes fully the doctrines of Stapleton vs. Stapleton, Pullen vs. Ready, and quotes in his judgment the case before Lord Hardwicke, of Corry vs. Corry, 1 Vesey, Sr., p. 19, which was an agreement to settle family disputes, the agreement being reasonable, though one of the parties was *drunk at the time.*    This was an agreement between a *son* tenant-intail and his *father* tenant-for-life on something for the benefit of minor children ; though the son complained of paternal authority having been exerted, which was true, yet as the *agreement was reasonable,* the Court not only would not set it aside, but actually enforced it.

Lord Alvanly, in Gibbons vs. Caunt, 4 Ves., 840, speaking of mere agreements of compromise between others, *not family arrangements,* uses this strong language : " If parties will, with full knowledge of the doubts and difficulties as to their rights, act upon them, though it turns out that one gains a

great advantage, if the agreement was *fair and reasonable at the time,* it shall be binding."

The cases cited abundantly establishes the position, that in Equity the *termination of family controversies furnishes a sufficient consideration* to support agreements for such purpose, and that its powers will be fully and readily used to enforce them.

It appears from the bill of Henry T. Smith *et al.*, that the agreement for the division of the estate of Wm. G. Smith was a fair and reasonable one ; indeed, so far as defendant, Boykin R. Smith, is concerned, he gets a very decided advantage in securing title to property he claimed, which otherwise would be a subject of controversy.   This agreement, according to a decision of this Court in the case of Moore vs. Gleason, 23 vol., 144, amounted to a reduction and possession of each child of his or her share.   It is difficult to regard the agreement here in any other light than as executed at least in part—the appointment of commissioners by all the parties to sell and divide, and the actual sale made of all the property except the share of said Boykin R. Smith, which was paid to him in kind, all strengthen the idea.   Besides, he has arrested the payment of the shares of the other children, and required of and received from the commissioners the proceeds of the sale in which he has no property.   Has he not by his conduct made himself as to the funds in his hands a trustee to and for the use of the other parties to the agreement, and, as such, liable to account?   We leave, however, this point open for decision below.   In conclusion, we say that the waiving of the advantages he had by the will of his father—with a knowledge of its provisions—at the time he entered into the agreement with his brothers and sisters, with a view to family harmony, furnishes *a sufficient consideration,* without anything else, for the agreement ; that he, the said Boykin, *is estopped by said agreement* from claiming anything through the will of his father—and there being no creditors of the testator concerned, the will ceases to be the law of distribution as to all who are parties to or claim through the agreement.   The agreement has *as to them* become the law

for the distribution of the estate of Wm. G. Smith, and should be enforced.

Judgment reversed.